Consuelo Cabinero León, Plaintiff and Respondent, *v.* Cobián Theatres of Puerto Rico, Inc., Defendant and Petitioner; Hanover Fire Insurance Co., Intervener and Respondent.

No. 11658. Submitted May 23, 1958.—Decided June 30, 1960.

928

*Víctor Gutiérrez Franqui, Luis F. Sánchez Vilella* y *C. Morales, Jr.* for petitioner. *Juan Enrique Géigel, Guillermo Silva, Jaime A. García Blanco* and *Hernán G. Pesquera* for plaintiff and respondent. *F. Ponsa Feliú* and *Luis Blanco Lugo* for intervener-respondent.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

On the night of May 17 to 18, 1949, a fire broke out in the building of the Rex Theater in Cataño, leaving it practically ruined. The plaintiff, as owner and lessor of the premises, filed this complaint against Cobián Theatres of Puerto Rico, Inc., lessee of the theater, suing it for damages in the amount of (1) $58,797.43, cost of reconstruction of the building and repair of the damage suffered therein; (2) $7,565.00, cost of repair of certain special equipment proper to this business; and (3) $18,011, value of the equipment for the projection and reproduction of sound, seats, screen, mechanical ventilators and other personal property which was totally destroyed. She also claimed rental at the rate of $375 a month not received from the date of the fire until October 26, 1949, date of the complaint, amounting to $2,033.25 plus the rental accrued during the suit.

The plaintiff alleged that she owned the premises where the Rex Theater was located and the equipment for the projection of motion pictures and other personal property installed in the theater; that from August 1, 1947 and by virtue of a 10 year lease the defendant came in possession of the theater and its annexes as well as the personal property installed therein, paying a monthly rental of $375; that on May 18, 1949 a fire broke out in said building totally destroying it together with the motion picture equipment and other personal property; that prior to May 18 Cobián Theatres had subleased to another person part of the theater building for the operation of a bar where food was served using kerosene stoves, without the plaintiff being notified of that sublease; that the fire broke out, pursuant to the plaintiff's information, in a kerosene stove in the subleased part; and that as a result of said fire the plaintiff suffered the afore-claimed damages. She also alleged that Cobián had ceased paying the monthly rental from the date of the fire.

The defendant answered accepting the lease of the building, the occurrence of the fire, and its failure to pay the rental after the fire. It denied other points and alleged affirmatively that the motion picture equipment and installations were exclusively its own not the lessor's; that it ceased holding the premises from the time of the fire since the latter became useless for the purposes for which it leased it, without the plaintiff having reconstructed it and placed it at its disposal; that it was not in possession of the premises at the time the complaint was filed; that when it came in possession of the real property in 1947 the part of the building which it allegedly subleased for a restaurant or bar was already held by another person as sublessee of a former lessee, and was devoted to the same purposes with the plaintiff's knowledge, and since 1936 there existed in the main building premises used as a bar; and that the fire broke out without any fault or negligence on the part of the defendant or any person to whom fault could be charged. Cobián Theatres

also alleged that the building was covered by an insurance policy of $35,000 with Hanover Fire Insurance Co. and on June 30, 1949 this company paid to the plaintiff for its loss the amount of $21,884.75; that the losses suffered totaled that sum and that from that date the company was subrogated in the rights and actions of the plaintiff, the latter not having any interest or cause of action as to damages for the destruction of the building.

After the case was submitted [1] the Superior Court concluded that the building leased consisted of the main premises devoted to a movie house which had been closed 18 months previously, and another independent premises devoted and used for a canteen which was occupied by a third person as Cobián's sublessee; that the cost of reconstruction of the building at the time of the fire less depreciation was $26,333.39; that certain destroyed installations were owned by the plaintiff and it fixed a recoverable value of $8,912.98, and that other motion picture equipment consisting of seats, screen, ventilators, projection equipment, as well as other personal property did not belong to the lessor but to the lessee-defendant. It stated that the evidence did not permit it to make any conclusions as to the term necessary to make the repairs which would have permitted the building to be leased again, nor as to the reasonable term needed to lease it. In relation to other points, the court

---

[1] The hearing of the case commenced on January 23, 1951 before the Hon. Pedro Pérez Pimentel and continued during March 13 and 14, with the introduction of all the evidence of both parties. The attorneys requested the transcript of evidence in order to prepare their briefs and pending these proceedings the Hon. Pedro Pérez Pimentel was appointed Justice of this Court. On November 30, 1953, more than two years later, a complaint of the intervener, Hanover Fire Insurance Co., was permitted, which alleged to have paid to the owner of the building, on June 30, 1949, the amount of $21,884.75 in payment of the loss she suffered for this fire and requested judgment against Cobián for said sum with interest from June 30, 1949. On March 18, 1954 a new hearing was held before the Hon. Jesús A. González and it was agreed to submit the case to him on the basis of the stenographic record. Three witnesses testified briefly before Judge González, two as evidence of rebuttal of the intervener and one as counter rebuttal of the defendant.

concluded that soft drinks and food were served in the sub-leased canteen for which a fluid gas stove was used, and that the fire originated in the kitchen of said canteen and from there it spread to the remainder of the building. It found proved that prior to May 18 there were two fire alarms in the building: after the former the defendant removed the fuses, locked the theater doors "to prevent hoodlums from entering," save one to give access to the person who did the cleaning, it had extinguishers and saw to the cleaning of the surroundings which was done frequently eliminating the garbage and papers. An employee of Cobián made monthly inspections to determine whether the theater was locked and clean. After the latter was closed down the lessee's employees did not visit the canteen.

In its conclusions of law the trial court was of the opinion that the defendant was liable for damages. It decided that the thing lost held by the lessee was presumed to have been lost through its fault and not through a fortuitous event; that in the specific case of fire the lessee is liable unless he proves that the fire arose from an extraneous cause and that there was no fault or negligence on his part, and that if he fails to prove the cause or origin of the fire the lessee is not relieved from his liability and the presumption that it was due to his fault will then be applied. Even assuming, the lower court continued, that the lessee is relieved from liability by proving that it took care of the property with the diligence of a good family father, the evidence would be incomplete because although it could be affirmed that Cobián took several precautions to prevent a fire, they were limited to the premises devoted to the motion picture house, but the fire did not originate in these premises but rather in the adjoining canteen and there was no evidence showing that precautions were taken in the canteen to prevent a fire therein. Pursuant to its conclusions it rendered judgment ordering the defendant to pay $26,333.39 as cost of reconstruction of the building of which sum $21,884.75 should be

paid to the intervener Hanover Fire Ins. Co. and the remainder $4,448.64 to the plaintiff with the sum of $8,912.98 for the installations destroyed.

Both parties appealed although we only need consider defendant's appeal.[2] The latter charges the lower court with the following errors: (1) in deciding that the defendant is liable for the loss occurred in the property leased for failure to show that the fire was due to a fortuitous event; (2) in determining that the defendant did not prove to have used the thing leased with the diligence of a good father of a family; (3) in assuming that it was incumbent on the defendant to rebut by the preponderance of the evidence the presumption of fault established by § 1453 of the Civil Code; (4) that the presumption of fault established by this section deprives the defendant of its property without due process of law and is contrary to the Fifth and Fourteenth Amendments of the Constitution of the United States and to § 7 of Art. II of the Constitution of the Commonwealth of Puerto Rico; and (5) that the court erred in granting to the plaintiff the value of the special installations of the Rex Theater notwithstanding her failure to have established said value at the time of the fire.

Sections 1445(2), 1451, 1453, 1458, 1136 and 1137 of the Civil Code (1930 ed.) 31 L.P.R.A. 4052, 4058, 4060, 4065, 3191 and 3192, are directly applicable to this case. Section 1445(2) compels the lessee to use the thing leased as a diligent father of the family, applying the same to the use agreed upon, and in the absence of an agreement, to the use which may be inferred from the nature of the thing leased according to the custom of the land. Section 1451 imposes on him the obligation to *return* the estate at the expiration of the lease *in the same condition in which he*

---

[2] The plaintiff limited herself to filing a notice of appeal without further steps to perfect it. Upon answering the defendant's brief she has not discussed that part of the judgment which was adverse to her in the light of her claims.

*received it*, except what may have been destroyed or impaired by time or by unavoidable reasons. Section 1453 makes the lessee liable for the deterioration *or loss* suffered by the thing leased, *unless he proves that it took place without his fault.* Section 1458 provides that if the thing leased is *lost* or any of the contracting parties do not comply with what has been stipulated, the provisions of § § 1136, 1137, 1054 and 1077 of the Civil Code shall be observed respectively.[3]

Proof of obligations devolves, pursuant to § 1168, upon the persons claiming their fulfilment, and that of their extinction upon those opposing it. Pursuant to the provisions of § 1451 which compel the lessee to return the property in the same condition in which he received it, the plaintiff limited herself to offering evidence of the fact itself of the fire which destroyed the property and of the damages which she allegedly suffered as a consequence thereof. *Ramírez* v. *Muñoz et al.*, 33 P.R.R. 350 (1924); *Del Valle* v. *M. González & Co.*, 39 P.R.R. 739 (1929). Pursuant to § 1168 in harmony with § § 1453, 1136 and 1137 it was incumbent on the defendant to prove that said obligation to return was extinguished by loss of the thing. At this point, the question turns on whether the defendant proved that the loss took place *without its fault* —§ 1453— and contrary to the presumption that it occurred through its fault—§ 1137—and not by a fortuitous event or lack of fault, as Puig Peña calls it when speaking about nonfulfilment.[4] We must decide then, whether or not there was fault on its part in the loss of the thing leased which otherwise would extinguish

[3] Section 1136—31 L.P.R.A. § 3191—under the heading referring to the extinction of obligations provides: "An obligation, consisting in the delivery of a specified thing, shall be extinguished when said thing should be *lost* or destroyed *without fault of the debtor* and before he should be in default." Section 1137—31 L.P.R.A. § 3192—: "Whenever the thing should be lost, when in the possession of the debtor, *it shall be presumed* that the loss occurred *by his fault* and not by a *fortuitous event,* unless there is proof to the contrary and without prejudice to the provisions of section 1049."

[4] IV–1 *Derecho Civil Español* 237.

the obligation of the lessee herein to return it in the same condition in which it received it.

The mention of fault immediately brings into consideration § 1057 of the Civil Code (1930 ed.) —31 L.P.R.A. § 3021—which provides that "The fault or negligence of the debtor consists of the omission of the steps which may be required by the character of the obligation, and which may pertain to the circumstances of the persons, time, and place"; and that "Should the obligation not state what conduct is to be observed in its fulfilment, that observed by a good father of a family shall be required." It happens that § 1445(2) particularly applicable to leaseholds, provides the same rule of a diligent father of the family in the use of the thing (*"culpa levis in abstracto"* of the Roman law.)[5] Section 1057 requires a fortiori an evaluation of the specific facts and circumstances of each case in determining the guilt or its absence.[6] Let us examine the facts and circumstances

---

[5] M. M. Traviesas, *La Culpa*, 13 *Revista de Derecho Privado* 273 (289).

[6] On this point José Castán Tobeñas states: "The essence of fault ( . . . . . ) is contained in the lack of diligence and foresight presumed on the part of the author of the act. In this sense the Civil Code defines a fault as 'the omission of the steps which may be required by the character of the obligation, and which may pertain to the circumstances of the persons, time and place' (§ 1.104).

" . . . . But in modern times, and as a reaction against the exaggerated complication of the Roman theories on degrees of fault, there has arisen that of judicial discretion, which surrenders the weighing of the fault and the extent of its responsibilities to the sound discretion of the courts, on the basis, as De Diego says, that it will always be necessary for the judge to consider the special circumstances of each case, and then, when he is fully aware of them, no rules are needed to reach an equitable decision (1). The most modern codes follow this trend; thus the German Code makes the award of damages and the amount thereof dependent on the discretion of the judge who freely weighs the facts (§ 254, par. 1).

"Our Civil Code establishes as a general test for the cases where the obligation does not state the diligence to be displayed in its fulfilment, that it should be the diligence observed by a good father of the family (§ 1.104, par. 2), which is taken as average or normal, type of diligent person (2). In this aspect the system of the Civil Code is influenced by the Roman system wherefrom it takes the type of slight fault (3). But it should be borne in mind that in defining fault, § 1.104,

in the four occasions when the court has had the controversy of this case under consideration: In *Ramírez* v. *Muñoz et al.*, 38 P.R.R. 17 (1928) the lessee of a masonry building in Caguas subleased a part for a grocery store, another part for a tobacco warehouse and to a third person. During the night a fire broke out causing damage to the building. The owner sued the lessee and the sublessees for the return of the property in the condition in which they had received it or the payment for deterioration. There was evidence to prove that after the fire was extinguished there was burnt tobacco and the smell of kerosene; that there were cans of kerosene unopened and unburnt and that the fire started within the building. To relieve themselves from fault, the defendants testified that they used to search the grocery thoroughly and lock it before going home, that they had a night watchman paid by the merchants to keep watch in the street; that when the fire occurred all the house was locked and that in their opinion it was caused by the electric wires because they had been the cause of other fires in Caguas; that kerosene was sold in the business; that the kerosene

---

par. 1, in the afore-stated terms, part of a subjective point of view, which devolved on the courts to determine in each particular case the proper conduct, and therefore, the fault for which the debtor was liable (1). Furthermore, from another point of view, the Code is inspired on the theory of judicial discretion upon authorizing that the liability arising from negligence may be mitigated by the court, according to the case (§ 1.103). As a whole this system signifies progress, by the flexibility with which it permits to adapt the idea of fault to each concrete type." 3 *Derecho Civil Español, Común y Foral.* (8th ed.), 146. In similar terms Puig Peña, *op cit.* at 245, 253, expresses himself, commenting on the old Roman theory of degrees of fault and diligence exercised: "Pursuant to the Code, one should only observe those steps which may be required by the character of the obligation, not in itself, but taking into account the circumstances of the persons, time and place. Only by way of suppletion, that is, when nothing transpires from the obligation or the latter is silent, it shall require the conduct to be observed by a good father of the family, which represents the average type of normal conduct (§ 1104, par. 2). In each case, then, the courts shall be the ones called upon to decide the standard of conduct, and whether for failure to observe it the debtor has committed fault." And see VIII-1 Manresa, (5th ed.), 192 *et seq.*

was not set on fire because the fire did not reach the place where it was; that before the fire they had a gasoline stand but they had suppressed that business; that the warehouse which housed the tobacco business was closed at six in the afternoon and was lighted by electricity; that before going to bed they used to go to the warehouse and push the doors to ascertain whether they were locked.

With regard to § 1466 (1911 ed., § 1453, 1930 ed.), this Court, upon reversing the judgment charging liability to the lessee, stated:

"A summary of the evidence of the defendants as a whole shows that they acted as prudent men in the use of the parts of the house which they had respectively subleased, for they locked the doors of the house each night after making an inspection, they paid their share of the wages of the night watchman employed by the merchants for watching each night their business premises, which was also done by a policeman. They showed that the part of the house occupied by them had electric light; that there had been other fire outbreaks in Caguas caused by electric wires; that J. Muñoz & Co. had removed a gasoline stand which they had installed as ordered by the owner if they failed to insure the house against fire, and though they kept in the grocery business some boxes of kerosene cans, the sale of that article was part of their grocery business. In view of that evidence, which has not been contradicted, we are of the opinion that the defendants showed that the fire which caused the damages to the house occurred without their fault and therefore the defendants are not liable for the repairs to the house."

In *Del Valle* v. *M. González & Cía.*, 39 P.R.R. 739 (1929), the liability of the lessee for the fire of the building leased, was upheld, but the decision rested not so much on whether or not the latter had succeeded in destroying the presumption of fault as on the fact that the lower court found proved affirmatively that the fire was due to the negligence of the employees of the defendant.

*Ruiz* v. *Umpierre*, 49 P.R.R. 262 (1935) upheld the liability of the lessee for the fire which occurred in a resi-

dence while the latter's son occupied and lived it, although the contract prohibited the subleasing of the premises. A reading of the detailed summary of the defendant's evidence which appears on p. 264 of the opinion, raises certain doubt in our minds as to whether in the light of our evaluation in the case of *Ramírez, supra*, the defendant did not also prove that the fire had not been due to the fault. The opinion itself reflects that doubt in stating that we were not at all satisfied that the defendant did not have a debatable case and we relieved him from the award of costs. Perhaps the court considered important the fact that the defendant had turned over the house to his son and that on at least one other period he had subleased it to a person who in turn permitted others to occupy it for purposes not consistent with due care and also that he did not present evidence, after the discovery underneath the staircase of a can from which smoke was coming out and was covered with a piece of sackcloth, that anything was done to take special care of the house.

Finally in *Puig* v. *Waldrop Photo Co.*, 54 P.R.R. 75 (1939) a building in San Juan was leased to the defendant under clauses in a public deed which stipulated that the lessee could not bring any inflammable materials nor explosives into the house. The lessee subleased the entrance hall and the upper part of the premises to a third person with the same prohibition regarding the introduction of explosives or inflammable materials. There was an explosion and a fire broke out in the subleased portion which caused considerable damage to the entire premises. The complaint was dismissed and plaintiff assigned as error the holding that the defendant was not at fault nor negligent and that it had acted diligently like a wise administrator, merely because it had stipulated that the sublessee should not bring into the house inflammable or explosive materials; and because the defendant failed to produce any evidence to overcome the presumption of fault established by §§ 1137

and others of the Civil Code. It was stipulated that an explosion had occurred, followed immediately by a fire as a result of the storage of several packages of torpedoes which the sublessee had stored in the floor subleased to him. Considering the point that the lessee had not overcome the presumption of law as to his fault, we said:

"It can be safely concluded that defendant had no active part in the storing of the explosives. The mere fact that their introduction took place in the subleased part of the building would tend to support such a conclusion. After an analysis of the circumstances, we are inclined to uphold the decision of the lower court. The reasoning would necessarily start out from the fact that the Waldrop Photographic Co. had bound itself not to introduce inflammable materials into the building. There is no evidence that its business was such as to make such introduction probable, nor that there was reason to believe that the defendant had ever at any time directly violated such a clause. Consistent with the agreed restriction and with a consciousness of its sense of responsibility thereunder, the defendant inserted such a limitation in the deed of sublease. Thereafter the fire took place and there was an express denial of any knowledge or responsibility with regard to its source or effects. This may be seen from the notarial demand for repairs (*Acta de Requerimiento*) which appears in the record. It is extremely difficult to prove a negative state of facts and much more so when such proof is required as to a state of mind. By this we mean that defendant could do little more, if anything at all, than deny knowledge."

In order to determine, in the light of those precedents and the applicable doctrine, whether or not the defendant proved to be exempted from fault for the occurrence of the fire, it is necessary to set forth a series of additional facts and circumstances revealed in the record which the trial court did not mention in its findings. The plaintiff's evidence showed that in 1935 Rafael Arcelay and Francisco Rodríguez constructed the theater in partnership and then prepared a site or annex measuring about ten feet wide by fifteen feet long at the entrance of the lobby to be used by

Rodríguez as a canteen or soda fountain. Rodríguez operated the business for some time and then leased it to another person. On May 29, 1936, Arcelay accompanied by his wife, plaintiff herein, and Rodríguez, leased the theater, including the canteen premises held by a third person, to Rafael Ramos Cobián, for a period of six years and an extension of four, the lessee remaining authorized to sublease. Rafael Ramos Cobián, president of the defendant, testified that from the beginning said canteen housed a kerosene stove and another heating appliance, and the business was well-known for the confection of *"pastelillos"* which everybody ordered; upon closing down the theater in November 1947 the canteen remained in operation because it was not part of the theater, it was attached to the building but stood out as something independent therefrom. He testified that after locking it he was informed that smoke had burst forth from the theater and that the firemen came and the next day he ordered all the fuses in the installation removed and the current disconnected; he learned that it was not due to the electric current but rather to the fact that someone inside the building had fallen asleep while smoking and some papers had taken fire, and he ordered all the doors to be locked and notified the police. He did not have any films there. He kept his books in the premises which he used as office. There were extinguishers in good conditions examined yearly by the firemen. He closed down the Rex theater in November 1947, after putting in operation another one which he constructed nearby, because of unsafe conditions which it offered the public according to the reports of the firemen and the Department of Health; after it was closed down he visited the premises two or three times, the last time being about three months before the fire; he did not leave a watchman there, but a janitor from the other theater used to go and inspect the place and clean it, and the other employees went there often. He

asked the owner of the canteen, who was a police captain, to have the police watch the theater.

Witness Humberto Rodríguez Pardo testified that the canteen was operated by one of the owners of the theater when it was constructed, that he subleased it in 1940 and kept the business of the sale of coffee, "*pastelillos*," refreshments, etc., until January 1948, when he sold the business to José Cedeño; there was a bar in front and a glass partition on a concrete wall which was six feet high, rendering visible the place where the "*pastelillos*" were prepared; the stove contained kerosene and stood on a concrete base between two walls of concrete also. Cooking stopped at about 10:30 p.m. and before closing he would remove the gas tanks, putting them aside to see if the stove was well turned off. The firemen inspected the business every month and he received no complaint from them. About two weeks after the theater was closed down an employee of Cobián in charge of the property, removed the fuses. There were two fire alarms, one before the theater was closed down, due to cigarettes which were thrown on the roof and another, when some papers were burned after it was locked. Eduardo Regal said that he was in charge of the defendant's properties; shortly after the Rex was closed down he removed the fuses from the building to eliminate the electric current and blocked all the doors, except one, to allow cleaning; the extinguishers were located in place as required by the firemen; the janitor of the other neighboring theater would clean the premises periodically and the witness frequently went to inspect it. He blocked the doors more firmly after he found some burnt papers. He might have been at the building three days or a week before the fire. He knew that there was a kerosene stove in the canteen and that coffee was brewed. He used to go and collect the rent from Rodríguez Pardo and he would see the stove from the counter.

The intervener presented as evidence of rebuttal the testimony of Francisco Castillo, first witness heard by the

trial judge. He said he was a paid watchman in the section of the Rex theater, at about one o'clock he heard a noise within the canteen as if something fell, he saw a light and another person forced the door and he saw fire in a stack of beer cases that were close to the stove. He saw kerosene tanks there and a stove leaning on the stack sideways. They went into action and the policemen notified the firemen. The canteen was a separate spot from the theater. The defendant presented in counterrebuttal the testimony of José A. Cedeño, Police Captain, who operated the canteen at the time of the fire. He said that he sold refreshments and "pastelillos" and had discontinued the food and that the stove did not have any gas in the tanks. He used to pay the rent by mail and nobody went personally to collect. Cobián went several times to the canteen after the theater was closed. He was notified of the fire at his home and upon arriving it was practically extinguished. The intervener offered the testimony of detective Carlos A. Rodríguez, to the effect that in May 1949, snacks and sea food were sold there.

Aside from the foregoing evidence, the record shows that the plaintiff acquired the property on January 7, 1942, in liquidation of conjugal property and knew that there was a canteen there. On July 25, 1947, she leased the theater to the defendant Cobián Theatres, represented by its president Rafael Ramos Cobián, including the canteen premises, at that time held by Humberto Rodríguez Pardo, as sublessee, for the term of 10 years as of August 1, 1947. The defendant was authorized to freely sublease the property. Three months later, on November 27, 1947, the theater was closed down. The canteen in possession of the sublessee, although attached to the building, was an independent body and remained in operation.

The petitioner maintains that to be released from its liability it merely had to prove that it used the thing as a diligent father of a family and that that was its obligation pursuant to § 1445(2). The respondents argue on the

contrary that to be released it was not sufficient for the latter to prove such thing—which would be at the most a factor to be considered in determining the *degree* of liability—, but rather that it was bound to prove affirmatively that the loss was due to a fortuitous event and it is the duty of the lessee pursuant to § 1451 to return the thing in the same condition in which it received it, except what may have been destroyed by unavoidable reasons. These two obligations, to use the thing with the diligence of a good father of a family and to return it in the same condition in which he received it, except what may have been destroyed by unavoidable reasons, are neither in the field of reality of the facts nor in the doctrinal scope so unconnected with each other as presented by the litigants, particularly the respondent. When final liability must be produced the Code itself arranges them in the common area of fault.

An *unavoidable* cause which relieves from the obligation to return the property in the condition in which it was received, as Manresa says—Vol. 10, 5th ed., p. 601—and is accepted, is the *fortuitous* event. But immediately thereafter the commentator states that that section "does nothing more than apply the general doctrine of obligations" and points to § 1105 (§ 1058 of our Code), where no one shall be liable for events which could not be foreseen or which having been foreseen, are inevitable and to § 1182 (§ 1136 of our Code) dealing with the extinction of the obligation to deliver a thing when said thing should be lost without fault of the debtor. And as to the obligation to use the thing as a diligent father of a family, Manresa states, *op cit.* at 555, that the lessee has at his disposal a thing belonging to another "and is strictly *debtor* thereof since he shall *return* it at the expiration of the lease" (italics ours) ; and that "in this concept" without the Code saying anything on the commented section (§ 1445(2) of our Code) "it would be subject to the provisions of § 1.104 [§ 1057] which says that the fault or negligence of the debtor consists in the

omission of the steps which may be required by the character of the obligation, and which may pertain to circumstances of the person, time, and place, and that where the obligation does not state what conduct is to be observed in its fulfilment, that observed by a good father of the family shall be required. But the Code has set forth expressly in this place the conduct of the father of a family; that is, the average conduct, as binding on the lessee, to indicate that he shall observe it not only insofar as he is debtor thereof but in the acts of its use or, in other words, as such lessee."

It is clear that upon determining the liability of the lessee as debtor of the thing for its loss or deterioration, there can be no absolute abstraction of the concept of the conduct that the latter should have observed in the use thereof, especially since § 1453 places such liability on the latter's fault, and also bearing in mind the provisions of § 1057. As liberating or extinguishing agent of the obligations, the fortuitous event in the positive concept is that event which could not be foreseen or which having been foreseen, was inevitable, pursuant to § 1058 of the Civil Code. —31 L.P. R.A. § 3022. A more modern tendency used by José Castán for reasons which he explains and are followed by many commentators, tends to define the fortuitous event which relieves from liability more simply by way of exclusion, and as Castán himself calls it, "with negative formula." Thus he says that the most important application of the fortuitous event is its reason of nonliability in the nonfulfilment of the obligations, and that "in this sense it may be defined (with negative formula) as that accident not chargeable to the debtor which precludes the exact fulfilment of the obligation," although he later defines it also with the positive elements of § 1058 "as the event not chargeable to the debtor, unforeseen or foreseen, but inevitable" which prevents fulfilment.[7]

---

[7] 3-*Derecho Civil Español Común y Foral* (8th ed.), 152-53. Castán explains:

"The concept of fortuitous event integrated by these positive elements

Puig Peña, after stating that liability is traditionally understood as a consequence of fault, and that to declare a person liable for a certain event it is absolutely necessary to relate it to the general principles governing fault, referring to the "*casus*" says that "the foregoing shows that the exact and correct test for defining the fortuitous event is the *negative or per exclusionem*, defining it as any event not chargeable to the person obliged." [8]

---

has had great historical preponderance, condensed in Vinnio's famous definition: '*omme quod humano captu prævidere non potest nec cui præviso potest resistit*' (1). Its meaning has passed to many modern Codes including ours, as we have just seen, among others.

"A great part of modern doctrine has challenged that traditional concept, adducing that in view of the variety of the notion of fortuitous event, because of the intimate relation that it must bear with the degree of diligence to be observed by the debtor in each concrete case, it is impossible to give a positive definition of a fortuitous event, but merely a negative concept or by exclusion, as fact not chargeable to fault of the debtor, which prevents fulfilment of the obligation (2).

"But a good number of authors, like Giorgi, return to the traditional subjective concept, considering that it is the only one that does not permit confusion between excusable fault and the fortuitous event and the one that answers to the meaning of the Codes inspired by the Roman law (3).

"The German Code follows the new criterion: it does not define the fortuitous event nor particularly speaks of it and identifies it with the impossibility of performing the undertaking (see § 275).

"The Spanish Code is fundamentally influenced by the traditional concept; but actually it does not adopt a very clear standard in the face of the concept in question. Section 1.105 answers to the positive theory; but § 1.182, similarly to § § 1.122 and 1.147, seem to obey the negative theory. Valverde considers, without hesitation, that our Code accepts the classical concept of fortuitous event. Díaz Pairó (4) considers, as a rule, that preference should be given to the negative idea of the fortuitous event; but subsequently proposes a conciliatory solution. Puig Peña (1) does not risk an absolute deviation from the traditional formula and says that the positive theory of § 1.105 is the one most sought in our doctrine and jurisdiction."

[8] IV-I *Tratado de Derecho Civil*, 245–46. Discussing the conflict in the doctrines as to what was the real essence of a fortuitous event, which some placed on "unforeseeableness" and others on "unavoidability" and the difficulties which have arisen therefrom in concrete cases, Puig Peña says that due to this a great number of text writers favor the negative theory or theory of exclusion, relating it to the complete absence of fault. Like Castán, Puig Peña indicates the adoption by our Code of the negative theory in § 1136 and others.

At least with regard to the case of fire in the leased property, we have followed the formula of exclusion in the consideration of the fortuitous event. Our previous decisions did not compel the lessee to prove affirmatively the fortuitous cause of the fire; we only required him to prove his lack of fault in the event. Our doctrine could not be otherwise because although § 1451 declares the obligation of the lessee to return the property after using it in the same condition in which he received it, except what may have been destroyed or impaired by unavoidable reasons that is, by a fortuitous event, when his liability is involved for the actual loss of the thing, the Code exonerates him if he proves that it occurred without his fault, as provided by § 1453 and, by reference of § 1458, § 1136. By establishing the presumption of fault on the part of the lessee and not the fortuitous event, § 1137 places on said lessee the burden to prove the absence of his fault, but does not compel him, as does the French Code expressly in § 1733,[9] to prove the fortuitous cause—which he could not foresee or which having foreseen, was inevitable —of the fire.

The trial court's conclusion, was therefore erroneous as a question of law, to the effect that it devolves on the lessee to prove that the fire was due to a fortuitous event and that

---

[9] Section 1733 of the French Code added specifically for the event of fire, provides that the lessee is liable for the fire unless he *proves* that the fire was caused by a *fortuitous event, vis major,* or by a defect of construction or that the fire was communicated from an adjacent property. Even so, Laurent comments, French Civil Code, Vol. XXV, p. 333: "It is wondered whether the facts enumerated by law are the only ones which the lessee is allowed to prove. Should it be interpreted in the sense that the evidence to be presented by the lessee consists in establishing that the *loss has taken place without his fault?* These are the assertions of § 1732. Such is, in our concept, the meaning of § 1733; it is the opinion of the majority of authors and is sanctioned by the case law. But reasons for doubting are not lacking. There is more, we cannot admit all the reasons which are given in support of the opinion we set forth. (Author's italics.) Section 1732 to which it refers, similar to our § 1453, provides that "the lessee is liable for the deterioration which has taken place during his enjoyment unless he proves that it has taken place without his fault."

unless he proves the cause or origin of the fire he is not relieved from liability and the presumption of fault will be applied to him. That conclusion is contrary to the doctrine and provisions of the Code. Manresa, cited by the court in support of said conclusion and who among the commentators followed the traditional positive concept of the fortuitous event—the event which could not be foreseen or which having been foreseen was inevitable—in dealing with the specific case of fire of the thing leased merely reaches the following conclusion after examining the sections equivalent to §§ 1451, 1453, 1136 and 1137: "It necessarily follows that in order to be exempt from liability, the lessee must prove *that the fire* occurred without *fault or negligence* on his part." The judgment of January 8, 1929, of the Supreme Court of Spain cited also by the court in support of its conclusion, is not strictly applicable. It dealt with merchandise deposited in the customhouse which was destroyed by a fire. Ordinances of the customhouse which released the latter from the duty to deliver the deposit only in case of *vis major* were also considered, and the plaintiff had alleged specific acts of negligence on the part of the depositary. Before the court of first instance the State only limited itself to prove, presenting the record of the investigation, that it did not know the possible causes of the fire and that they could have been due to the deficient installation of electric current for lighting. The *Audiencia* decided that it was a case of a fortuitous event reversing the court of first instance and the judgment of the Supreme Court, in reversing the *Audiencia*, establishes the doctrine that the proven fact of ignorance of the cause of the fire does not bring about the affirmative conclusion that it was due to a fortuitous event. The judgments of October 7, 1899, and of March 26, 1928, cited in the judgment of January 9, 1929, dealt with merchandise burned in land transportation and applied § 361 of the Code of Commerce, equal to § 279 of the 1932 edition, which imposes on the carrier the obligation *to prove the accident*

*or force majeure.*   And see the judgment of June 12, 1950 where the liability of the lessee for the fire is discussed in terms of "his fault."

The evidence shows that the specific cause or agent causing the fire was unknown.   As we noted in the case of *Waldrop, supra,* it is extremely difficult to prove a state of negative facts, especially since a fire is not considered in itself a fortuitous event and human conduct plays a part. Upon deciding in this particular case what was the proper conduct to be followed or that should have been undertaken or if having failed to do so the defendant committed fault, pursuant to the diligence required by the nature of the obligation, we must consider that which attaches to the circumstances of persons, time and place which arise from the foregoing uncontroverted evidence —§ 1057— and which apparently were not weighed by the trial court.   There exists the fact that in constructing the theater with her husband, plaintiff herself had part of the building used as premises for the operation of a business which required therein the means for cooking food for the public; that Cobián individually in 1936 as well as the defendant in 1947 upon leasing the building already found persons holding these premises as sublessees operating that type of business, the presence of a stove with the necessary fuel for its use being consequently an ordinary or normal and not unusual act; that for thirteen years cooking was done in that place without this activity causing any threats of fire and the firemen inspected the business and never complained; the position of the premises which rendered the stove visible from any point thereof, and also the fact that when Rodríguez Pardo ceased holding the premises the person selected or tolerated by the defendant as sublessee was a high officer of the police force, on whom it could reasonably rely, due to his position, as a responsible and careful person aware of the risks of a fire.   Under these facts and circumstances the diligence observed by the defendant in making periodical inspections

and taking general care of the property was normally the proper one.

That evidence having been weighed [10] in the light of our decisions cited, of the applicable doctrine and provisions of the Code, we must conclude that there was no omission on the part of the defendant —§ 1057— in exercising the diligence required by the character of the obligation (slight fault of the father of the family, § 1445(2), "average or normal type of diligent person") and which pertain to the circumstances of persons, time and place as indicated by the evidence.

In view of the foregoing the judgment appealed from is reversed and another will be entered instead, dismissing the complaints, with costs on plaintiffs, without attorney's fees.

Mr. Chief Justice Negrón Fernández, Mr. Justice Pérez Pimentel and Mr. Justice Saldaña did not participate herein.

---

[10] We are in the same position as the trial court to weigh the evidence, since the case was submitted on the record, and as to the brief oral testimony presented before the lower court, we accept the manner it settled the sole conflict that arose with Cedeño's testimony to the effect that he had already discontinued serving food.